IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 12, 2026

## STATE OF TENNESSEE v. MARTY LYNN JUDD

**Appeal from the Circuit Court for Warren County**
**No. 19-CR-2571     Larry B. Stanley, Jr., Judge**

_____

### No. M2025-01544-CCA-R3-CD

_____

The Defendant, Marty Lynn Judd, appeals from his Warren County Circuit Court convictions of second degree murder and possession of a prohibited weapon, for which he received an effective sentence of twenty-six years' incarceration. On appeal, the Defendant challenges the sufficiency of the convicting evidence. He also asserts that the trial court erred by overruling his objections to hearsay and to leading questioning during the State's direct examination of a witness. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Circuit Court Affirmed**

STEVEN W. SWORD, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Amanda J. Gentry, Nashville, Tennessee, for the appellant, Marty Lynn Judd.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Michael J. Hurst,[1] Qualified Law Student; Matthew T. Colvard, District Attorney General for the appellee, State of Tennessee.

## OPINION

### I.     FACTUAL AND PROCEDURAL HISTORY

This case arises from the August 28, 2009 murder of the victim, Rebecca Mooneyham. The victim's case was designated as a cold case until the Defendant's

_____

[1] Mr. Hurst participated in this case as a qualified law student pursuant to authority granted by Tennessee Supreme Court Rule 7, section 10.03.

October 17, 2019 arrest. On December 6, 2019, a Warren County grand jury returned a two-count indictment charging the Defendant with one count of first degree murder relating to the victim's death and with one count of possession of a prohibited weapon relating to evidence recovered following the October 17, 2019 execution of a search warrant at the Defendant's home. The Defendant proceeded to trial on September 30, 2024.

James "Bo" Ramsey testified that he had worked as an investigator for the Warren County Sheriff's Department (WCSD) from 1998 until his retirement in 2024. Investigator Ramsey testified that in 2008, he was assigned to investigate a juvenile delinquency case involving the Defendant and the victim's son, Holden Mooneyham,[2] who was a minor at the time. Investigator Ramsey recalled that the case involved "some missing motorcycles" and that Holden ultimately gave a written confession to taking the motorcycles from the Defendant's home. A juvenile delinquency proceeding was held on October 6, 2008, in which the victim, who was not an attorney, acted as Holden's counsel. Investigator Ramsey stated that the juvenile delinquency petition was ultimately dismissed without prejudice because an essential witness was not present to testify at the proceeding. He recalled that the Defendant "became irate" after the case was dismissed and began screaming and yelling as he exited the courtroom.

Randal Gilliam testified that he had worked as an Assistant District Attorney General in Warren County from 2007 to 2022. Mr. Gilliam recalled that he represented the State at the October 6, 2008 juvenile delinquency proceeding. He further recalled that the proceeding involved an accusation that Holden had stolen the Defendant's motorcycles and "other miscellaneous property." He noted that he had believed the proceeding would be a "fairly simple matter" until the victim, acting as Holden's counsel, elicited proof that the Defendant's daughter had given Holden permission to ride the Defendant's motorcycles. Mr. Gilliam thereafter informed the juvenile court that he did not wish to proceed with the matter until he was able to speak with the Defendant's daughter. Accordingly, the juvenile court dismissed the juvenile delinquency petition without prejudice.

Mr. Gilliam stated that the Defendant "blasted through the back doors" of the courtroom after the case was dismissed. Mr. Gilliam recalled that he attempted to explain the case's procedural status to the Defendant, but that the Defendant refused to "listen[] to anything" Mr. Gilliam said to him. He described the Defendant as "very upset" with the case's outcome. On cross-examination, Mr. Gilliam noted that he initially requested a continuance after learning of the Defendant's daughter's involvement with the case and that the juvenile court denied this request.

---

[2] Because Holden Mooneyham shares the same surname as the victim and Mr. Mooneyham, we will hereafter refer to him by his first name for clarity. We intend no disrespect.

Devoni Barkes testified that the victim and Phillip Mooneyham were her parents. At the time of the victim's murder, Ms. Barkes lived in Nashville, where she was enrolled in mortuary science school, and the victim, Mr. Mooneyham, and Holden lived together in a home on Lawson Mill Road in McMinnville. She stated that the victim was a retired school bus driver.

Ms. Barkes recalled that she had bimonthly three-day weekends while enrolled in school and typically spent them at the victim's home. Ms. Barkes testified that she visited the victim on the weekend of August 28, 2009. On the morning of the 28th, Ms. Barkes and the victim went to a doctor's appointment, paid bills, ate lunch, and shopped for groceries together before returning home. When Mr. Mooneyham arrived home from work, the family attended a church revival service together. Afterward, the family returned home and ate dinner. Mr. Mooneyham and Holden went to their bedrooms, while the victim and Ms. Barkes retired to the living room.

Ms. Barkes described the victim's living room as including a recliner chair in which the victim routinely sat, read her Bible, watched television, and slept. Ms. Barkes noted that the recliner was angled to permit the victim to either watch television or look out the living room's picture window while seated. She also noted that the victim kept a keyboard piano in front of the picture window. Ms. Barkes testified that the victim used her keyboard to practice playing piano and to write songs for church. Ms. Barkes stated that an end table sat adjacent to the victim's recliner and separated it from a small couch.

Ms. Barkes testified that she sat on the couch and the victim sat in her recliner. There, Ms. Barkes and the victim talked, watched television, and eventually fell asleep. Ms. Barkes was unsure how long she had slept but stated that she was awakened at some point by a loud noise. She had fallen asleep with her back facing the picture window, and when she rolled over, she noticed that there was something on her face. Ms. Barkes wiped her face and saw the victim resting in her recliner "like nothing happened." She noted, however, that the victim had "something on her face." Ms. Barkes attempted to wake the victim by shaking her, but she was unsuccessful. Ms. Barkes then ran down the hallway to wake Mr. Mooneyham and Holden. After informing her father and brother that the victim was "hurt," Ms. Barkes called 911.

A recording of the 911 call was played for the jury. Ms. Barkes briefly spoke with the 911 operator and then handed the phone to Mr. Mooneyham, who identified himself. Mr. Mooneyham requested that an ambulance be sent to his home and stated that someone had driven past his home and "shot [his] wife in the head." Mr. Mooneyham explained that the victim had been sitting in her recliner when she was shot and that he had been lying in bed. He stated that he had "no idea" who might have shot the victim. He stated that

"half of [the victim's] head was missing" and that she was unresponsive and breathing heavily. He further noted that he heard someone "take off" shortly after he heard the gunshot and that the vehicle sounded like a "smaller car."

Ms. Barkes testified that after Mr. Mooneyham spoke with the 911 operator, he instructed her and Holden to go to their rooms and get dressed. An ambulance and police arrived shortly thereafter, and Ms. Barkes gave a written statement to law enforcement. Ms. Barkes later visited the victim at Vanderbilt University Medical Center, where her aunt helped her brush and remove "pieces of brain," "skull," and "glass" from her hair. Ms. Barkes recalled that the victim was placed on life support when she arrived at the hospital and removed from life support on the morning of August 29, 2009.

On cross-examination, Ms. Barkes testified that the victim's property on Lawson Mill Road was large. She recalled that the only vehicle she saw in the driveway on the night of the victim's murder was the victim's gold Jeep Grand Cherokee; she noted that she parked her own vehicle in a separate driveway elsewhere on the property. Ms. Barkes estimated that she and her family returned to the home between several days and a week following the shooting. She recalled that the victim's recliner had been removed, that there was a large hole in the picture window, and that there were several holes in the wall behind where the recliner had previously sat.

WCSD Investigator Jason Rowland testified that he responded to the victim's home at approximately 11:00 to 11:30 p.m. on August 28, 2009. When he arrived, he was informed that the victim had been shot in the head. After Mr. Mooneyham consented to law enforcement's request to search his home, Investigator Rowland began processing the crime scene. Investigator Rowland testified that he took photographs of the crime scene, and several were shown to the jury. These photographs depicted the victim's bloodstained recliner and its surroundings, the nearby couch, a bullet hole in the picture window, a bullet hole in the wall behind the victim's recliner, a computer desk through which the bullet penetrated, and the outside of the victim's home.

Investigator Rowland testified that he recovered several bullet fragments during his investigation, which he collected and sent to the Tennessee Bureau of Investigation (TBI) for examination. He stated that he and the other investigators formulated several theories regarding the victim's murder during the course of the investigation. He recalled that one such theory was that the victim had been shot in a drive-by shooting. Investigator Rowland opined that he disagreed with the drive-by shooting theory because this case involved a singular gunshot, whereas drive-by shootings typically involve multiple gunshots fired in a "linear pattern."

- 4 -

Investigator Rowland described Lawson Mill Road as a "loop" road, with two entrances. He stated that the Defendant lived approximately 800 yards from the victim. Photographs of the exterior of the Defendant's home, taken in 2019, depicted a 1986 Chevrolet Suburban parked in the Defendant's driveway. Investigator Rowland stated that this vehicle was registered in the Defendant's name.

On cross-examination, Investigator Rowland testified that he and other members of law enforcement remained at the victim's home for several days after the shooting as they continued their investigation. He agreed that the victim's recliner was moved at some point during the investigation as the investigators attempted to track the path the bullet would have taken through the picture window. He also agreed that he had seen several vehicles, including the 1986 Chevrolet Suburban, parked at the Defendant's home.

Investigator Rowland testified that law enforcement collected a firearm and ammunition from the victim's home, and that these items were also sent to the TBI for examination. On redirect examination, Investigator Rowland stated that the firearm recovered from the victim's home did not match the type of firearm used to shoot the victim.

Pamela Yates testified that she visited her sister's home on the evening of August 28, 2009, and then drove to her own home on Lawson Mill Road around 11:00 or 11:30 p.m. Ms. Yates recalled that it was dark outside and that there were no streetlights on Lawson Mill Road. As she drove home, Ms. Yates saw a large, dark-colored SUV with its headlights off round a curve in the road and drive towards her. Ms. Yates testified that she was forced to pull her vehicle into another home's front yard to avoid colliding with the SUV. Ms. Yates later recounted this incident to Dawn Taylor, who informed her that she "needed to talk to somebody." Ms. Yates ultimately gave a statement to WCSD Officer Kevin Murphy. Officer Murphy transcribed Ms. Yates's statement, and Ms. Yates signed the statement. She agreed that the statement described the SUV as light-colored, but she averred that she told Officer Murphy "numerous times" that the SUV was dark-colored.

On cross-examination, Ms. Yates agreed that Officer Murphy took her written statement in April 2010. She averred that Officer Murphy did not tell her that he was investigating the victim's murder when he took her statement. She maintained that she described the SUV as dark-colored to Officer Murphy and testified that she did not read Officer Murphy's transcription of her statement before she signed it.

Dr. Feng Li testified that he performed the victim's autopsy on August 30, 2009. Relying upon his autopsy report, Dr. Li testified that the victim had been sitting in her home when she "was shot multiple times through the window in a drive-by shooting." Dr. Li agreed that he received this information from Vanderbilt University Medical Center

following the victim's arrival and treatment. He stated that the victim had suffered a gunshot wound to the right side of her forehead, which caused "extensive injury to the right hemisphere." He also noted that the victim suffered two superficial wounds to her abdomen, which he averred could have been caused by the bullet's striking something nearby as it traveled towards the victim, but were not gunshot wounds. He testified that the healthcare workers who initially treated the victim may have confused the victim's abdominal wounds for additional gunshot wounds. Dr. Li testified that the victim's cause of death was a gunshot wound to the head and that her manner of death was homicide.

Steve Scott testified that he worked as a Special Agent for the TBI's Crime Laboratory from 1986 until his retirement in 2016. Special Agent Scott testified that in September 2009, he examined evidence recovered from the victim's home following her murder. He recalled that he examined a Model 70 .300 Winchester Short Magnum bolt-action rifle. After test-firing this firearm, Special Agent Scott concluded that it was incapable of firing the bullet that killed the victim.

Special Agent Scott testified that he also examined the bullet fragments recovered from the victim's home. He noted that the fragments included a steel core, or "penetrating rod," which he described as one of the "most internal" parts of a bullet. He explained that these parts of a bullet are typically encased in a thin sheet of lead and a copper or steel jacket. During his examination, Special Agent Scott compared the fragments to an ammunition sample of a 7.62x54R cartridge. Special Agent Scott removed the core from the ammunition sample and concluded that the fragments were similar in shape and design to a 7.62x54R bullet, although he noted that the fragments were slightly shorter than the core taken from the ammunition sample. Special Agent Scott concluded that the fragments' class characteristics were consistent with ammunition fired by 7.62x54R Russian caliber rifles, which included Russian Dragunov, Mosin-Nagant, and Izhmash Dragunov Tiger model rifles. Special Agent Scott concluded that the bullet which struck and killed the victim was fired from a 7.62x54R caliber rifle.

Dennis Judd[3] testified that the Defendant was his father. Dennis recalled that he, his wife, and their two children moved into the Defendant's home in November 2012. He also noted that he and the Defendant worked together as correctional officers at the Bledsoe County Correctional Facility until Dennis was fired in 2014. Dennis stated he was unsure why he was fired. Dennis testified that he and the Defendant returned home from work together on the day he was fired. During their drive home, the Defendant and Dennis began talking about "making mistakes," and the Defendant informed Dennis that he had shot and

---

[3] Because Dennis Judd shares the same surname as the Defendant, we will hereafter refer to him by his first name for clarity. We intend no disrespect.

killed the victim. Dennis believed that the Defendant was upset about his firing and feared that the Defendant might "go after" his supervisor.

Dennis testified that he later told his friend, Jason Petrie, about the Defendant's confession. He also recalled that he gave a written statement to law enforcement following the Defendant's October 17, 2019 arrest. In this statement, Dennis indicated that the Defendant informed him that he had driven up close to the victim's house, walked up "by the bushes," and saw the victim sitting in a chair. The Defendant stated that he shot the victim once through her window and then returned to his home. The Defendant also showed Dennis the victim's home. Dennis opined that he believed the Defendant was "angry over the whole theft thing."

On cross-examination, Dennis testified that he had briefly worked as a correctional officer for the Coffee County Sheriff's Office (CCSO). He also agreed that he worked at Riverbend Maximum Security Prison following his termination from the Bledsoe County Correctional Facility and that he was terminated from that position for bringing contraband into the facility in September 2018. He stated that he was convicted of a Class C felony for this offense and received a sentence of three years' probation. Dennis testified that he was on probation at the time of the Defendant's arrest.

Dennis recalled that, on the evening of October 17, 2019, he took a shower and heard a knock at his door. He stated that only he and one of his children were present in the home at this time. Dennis answered the door and spoke with an investigator, whom he recognized as a CCSO investigator but could not recall the name. The investigator informed Dennis that "some individuals" wished to speak with him, and Dennis accompanied the investigator to the CCSO. Dennis recalled meeting with several investigators at the CCSO, including a TBI agent and Warren County Sheriff Jackie Matheny, Jr.

Dennis testified that, during his October 17, 2019 interview, the investigating officers told him that the Defendant had been arrested and that they wanted to discuss allegations of the Defendant's having killed someone. He recalled telling the investigating officers that he got along with the Defendant and that the Defendant supervised Dennis's children daily. He agreed that he felt uncomfortable and emotional during the interview and that he did not feel free to leave. He was unsure how long his interview lasted, but he agreed that he signed a written statement at the end of the interview summarizing his account of the Defendant's confession.

Dennis testified that he received phone calls from the Defendant shortly after the Defendant's arrest. He recalled that he spoke with the Defendant frequently and that the Defendant's grandchildren missed him. Dennis also agreed that he wished the Defendant

a happy Father's Day in a Facebook post. In his post, Dennis wrote, "I wish I could just send a text telling you that I wouldn't be the father that I am today if it wasn't for you and maybe we will get to spend the next one with you." Dennis testified that, although he did not recall when he posted this Facebook post, he had not posted about his father recently.

Dennis recalled that he testified at the Defendant's December 2, 2019 preliminary hearing. He averred that, although he testified he did not believe the Defendant's confession was true during the Defendant's preliminary hearing, he now believed the Defendant's confession was true.

Dennis further recalled that he gave a statement to the District Attorney General's Office on August 3, 2024. In this statement, Dennis described the Defendant as an abusive father, noting that the Defendant was "tough" on him and punished him for bad grades. He noted that the Defendant had told him he had disposed of the firearm he used to kill the victim in the wooded area across the road from his Lawson Mill Road residence. He agreed that he knew this information during his October 17, 2019 interview with law enforcement and did not provide it during that interview.

WCSD Sheriff Jackie Matheny, Jr., testified that he had previously worked as an investigator for the District Attorney General's Office, where he was tasked with investigating cold cases. Sheriff Matheny recalled that, during his tenure with the District Attorney General's Office, he investigated the victim's murder. During his investigation, Sheriff Matheny found a statement that Dennis had given to his friend, Mr. Petrie, about the Defendant's confession. Sheriff Matheny also reviewed the record of the October 6, 2008 juvenile delinquency proceeding involving Holden's alleged theft of the Defendant's property. Sheriff Matheny also found a Facebook post which depicted Dennis in a "light-colored room with blue curtains" and "what appeared to be the stocks of three long guns hanging on a gun rack on the back wall." He described these firearms as "military-style rifle[s]." Sheriff Matheny subsequently reviewed the TBI report of the examination of the evidence recovered from the victim's home following her murder and researched Russian caliber firearms. Sheriff Matheny averred that the firearms depicted in the Facebook post appeared similar to Mosin-Nagant rifles.

Sheriff Matheny testified that he procured and executed a search warrant for the Defendant's home on October 17, 2019. He recalled that the Defendant was present at his home when he executed the search warrant and disclosed that he owned "two or three" Mosin-Nagant rifles. Sheriff Matheny stated that the investigating officers recovered six Mosin-Nagant rifles, as well as a large amount of 7.62x54R ammunition. He also recalled that the investigating officers recovered a Colt AR-15 rifle that had been modified to fire automatically.

The State introduced several recordings of jail phone calls via Sheriff Matheny's testimony. In the first jail phone call, dated October 21, 2019, the Defendant spoke with his daughter, Michelle,[4] and Dennis. Michelle and the Defendant discussed Michelle's attempts to procure private legal counsel for the Defendant with the assistance of "Uncle Andy." Michelle also asked the Defendant where he kept his tax returns from 2009 so she could determine where he was on the night of the victim's murder. The Defendant responded that he was unsure where he kept his tax returns, but that he was at home on the night of the victim's murder. He recalled that Lisa had been visiting a friend that evening. Other than a brief visit from a friend's wife who stopped by his home to ask if he knew "what was going on," he was home alone the entire evening.

In the second jail phone call, dated October 23, 2019, the Defendant spoke with Dennis. The Defendant stated that law enforcement was "grasping at straws" in their investigation and that he "should be able to get that homicide charge dismissed" once law enforcement "checke[ed] the ballistics" on the firearms seized from his home. He maintained that the firearms seized from his home would "come back clean."

In the third jail phone call, dated November 7, 2019, the Defendant spoke with Michelle and Lisa. The Defendant asked his daughters to ask the attorney with whom they had been consulting to tell them "who the witness is" and to "let Uncle Andy know" what the attorney stated. He averred that the witness's identity would be "pretty comical" if it was who he suspected; he further stated that the witness was not credible and that the witness could not have witnessed anything tying the Defendant to the victim's murder. He opined that it would not matter whether ballistics testing was complete on the firearms seized from his home by the time of his preliminary hearing because they were not "the murder weapon."

In the fourth jail phone call, dated November 11, 2019, the Defendant asked Michelle to ask "that lawyer" to speak to him after he received discovery materials. The Defendant also stated that law enforcement had "jumped the gun" in its investigation. In the fifth jail phone call, dated February 13, 2020, the Defendant spoke with Dennis, who was crying. The Defendant told Dennis to "cheer up" and that the case would "work itself out." The Defendant told Dennis that his statement did not mean anything. The Defendant also encouraged Dennis not to perjure himself but reminded him to "cover [his] ass." Dennis stated that he was no longer speaking to Michelle, and the Defendant stated that they should not discuss that on the phone.

---

[4] The transcript and recordings of the Defendant's jail phone calls refer to the Defendant's daughters, Michelle and Lisa, only by their first names. For consistency, we will hereafter refer to them by their first names only. We intend no disrespect.

On cross-examination, Sheriff Matheny recalled that he spoke with the District Attorney General after executing the search warrant at the Defendant's home on October 17, 2019. Sheriff Matheny agreed that he was looking for a Mosin-Nagant rifle when he executed the search warrant. He agreed that he had described Mosin-Nagant rifles as rare during the Defendant's December 2, 2019 preliminary hearing. He averred that he had never known anyone who possessed a Mosin-Nagant rifle and had not seen one involved in a crime until this case. He stated that the District Attorney General instructed him to "charge [the Defendant] with the AR[-15]" after the execution of the search warrant.

Sheriff Matheny also recalled that he, Investigators James Sherrill and Stuart Colwell, and TBI Special Agent Elizabeth Williams interviewed Dennis at the CCSO following the Defendant's arrest.[5] Sheriff Matheny testified that Investigator Colwell handled most of the questioning during the interview. Following the interview, Sheriff Matheny again spoke with the District Attorney General, who instructed him to sign warrants for the Defendant's arrest for "criminal homicide." He agreed that, prior to Dennis's interview, he would not have had sufficient evidence to charge the Defendant in relation to the victim's murder. On redirect examination, Sheriff Matheny agreed that Dennis's testimony was consistent with his statements during his October 17, 2019 interview. On recross-examination, he also agreed that Dennis's August 3, 2024 statement was more detailed than his October 17, 2019 interview.

Tennessee Highway Patrol Sergeant John McFarland testified that he was assigned to the Critical Incident Response Team. Sergeant McFarland recalled that on October 29, 2019, Special Agent Williams contacted him to request that he visit the victim's home. There, Sergeant McFarland took photographs and created digital scans of the interior and exterior of the victim's home. He later compiled a report on the methodology he used to create the digital scans. Sergeant McFarland's photographs and digital scans were introduced as exhibits.

Howard Ryan testified that he worked in crime scene recreation and operated Highlands Forensic Investigation and Consulting. He recalled that Special Agent Williams and Sheriff Matheny requested that he "take a look at" the victim's case. Mr. Ryan reviewed crime scene photographs, investigative reports, the victim's autopsy report and photographs, and Sergeant McFarland's digital scans of the victim's home. Mr. Ryan also took aerial photographs of the victim's home and measured the distance between the damage in the wall behind the victim's recliner and the window. Mr. Ryan thereafter created a three-dimensional rendering of the victim's home and modeled the trajectory the

---

[5] The State played a recording of Dennis's October 17, 2019 interview through Sheriff Matheny's testimony. It does not appear that this recording was made an exhibit to the trial, and it is not included in the record on appeal.

bullet would have taken after it was shot through the picture window.  He concluded that the bullet was fired from the front of the victim's home through the picture window, struck the victim as she sat in her recliner in the living room, and landed in a desk in the kitchen.  Mr. Ryan's renderings and report were introduced as exhibits.

The State recalled Investigator Rowland as a witness.  Through Investigator Rowland's testimony, the State introduced several photographs taken during the October 17, 2019 execution of the search warrant for the Defendant's home.  Investigator Rowland testified that law enforcement seized six Mosin-Nagant rifles from the Defendant's home, as well as a Mauser 98 bolt-action rifle, which he described as ballistically similar to a Mosin-Nagant rifle.  He described Mosin-Nagant rifles as military rifles.  Investigator Rowland also testified that law enforcement seized an AR-15 platform rifle from the Defendant's home.  He identified this firearm in photographs and noted that an extra pin had been drilled into the firearm's right side, almost directly above the trigger.  He stated that the firearm had been modified to allow it to fire automatically, and he described it as a prohibited weapon.  He also noted that law enforcement found a drill bit in the Defendant's home.

TBI Special Agent Denver Hall testified that he worked for the TBI's Firearm and Toolmark Identification Unit.  Special Agent Hall testified that he examined the firearms and ammunition seized from the Defendant's home.  In his amended report of his conclusions, dated April 5, 2023, Special Agent Hall noted that, among other evidence, he received and examined six Russian Mosin-Nagant rifles, one Hungarian Mosin-Nagant rifle, one eight-millimeter Mauser caliber rifle, a Colt model 5.56 millimeter caliber AR-15 firearm, and 365 7.62x54R ammunition cartridges.

Special Agent Hall testified that he test-fired the seized Mosin-Nagant rifles and found them functional; however, he noted that their internal barrels were "very rusted."  Special Agent Hall also test-fired twenty-four rounds of the 7.62x54R ammunition recovered from the Defendant's home.  He opined that this ammunition was similar to the bullet fragments recovered from the victim's home; however, he noted that the condition of the seized Mosin-Nagant rifles' barrels prevented him from determining whether the rifles recovered from the Defendant's home had fired the bullet which struck the victim.  He also noted that Mosin-Nagant rifles used corrosive ammunition, which can damage the firearm's barrel when fired.  He stated that the bullet fragments recovered from the victim's home were "in a very damaged condition" due to their corrosive nature by the time he examined them.

Special Agent Hall described the seized Mosin-Nagant rifles as Russian Army rifles "issued prior to World War I through World War II" throughout the former Soviet Bloc countries.  He averred that approximately thirty-seven million such firearms were

manufactured before they were discontinued. Special Agent Hall estimated that he had examined 10,000 firearms in relation to criminal cases and that this case was the first time he had ever examined a Mosin-Nagant rifle.

Special Agent Hall testified that he examined the Colt model 5.56 millimeter AR-15 rifle. He testified that this firearm had been modified by adding an "auto sear," which permitted the firearm to fire fully automatically. He opined that this modification permitted the firearm to function as a machine gun. The State rested after this testimony.

The Defendant moved for judgment of acquittal, which the trial court denied. The Defendant then recalled Sheriff Matheny as a witness. Sheriff Matheny testified that he was present during Dennis's August 3, 2024 interview. He testified that Dennis provided new information to law enforcement in this interview; he specifically noted that the Defendant told Dennis he had disposed of the firearm he used to kill the victim "down by Lawson Mill Road in the wooded area." Sheriff Matheny recalled that law enforcement officers searched a pond across the road from the Defendant's home and did not recover a firearm.

Following a *Momon* colloquy, the Defendant elected not to testify and presented no additional proof. The Defendant did not renew his motion for judgment of acquittal at the close of proof.

Upon this evidence, the jury convicted the Defendant of second degree murder as a lesser-included offense of first degree murder and of possession of a prohibited weapon as charged. Following a sentencing hearing, the trial court imposed an effective sentence of twenty-six years' incarceration. The Defendant filed a timely, but unsuccessful, motion for a new trial. This timely appeal followed.

## II.    ANALYSIS

On appeal, the Defendant challenges the sufficiency of the convicting evidence. He also asserts that the trial court erred by overruling his objections to hearsay and to leading questioning during Dennis's testimony. The State responds that the evidence is sufficient and that the trial court did not err by overruling the Defendant's evidentiary objections. We will address these issues in turn.

### A. SUFFICIENCY

Firstly, the Defendant argues that the trial court erred by denying his motion for judgment of acquittal, by approving the jury's verdict as the thirteenth juror, and by denying his motion for a new trial because the evidence is insufficient to sustain his

convictions. Regarding his conviction of second degree murder, the Defendant contends that the ballistics evidence from the firearms seized from his home was inconclusive and did not directly match the bullet fragments recovered from the victim's home. He notes that the State's theory of the case hinged on its contention that the victim could have only been shot with a "particular kind" of firearm; the Defendant concedes he owned such a firearm, but he posits that it is "unknown how many people in the area" also owned such firearms. The Defendant further asserts that Ms. Yates and Dennis were not credible witnesses because their previous statements differed from their trial testimonies.

Regarding his conviction of possession of a prohibited weapon, the Defendant contends that the State relied upon "biased witnesses interested in an outcome in favor of the State." The Defendant further asserts that both of his convictions were against the weight of the evidence because the State relied upon testimony from "witnesses aligned with law enforcement and prosecution." The State responds that the evidence adduced at trial is sufficient to sustain the Defendant's convictions. We agree with the State.

Tennessee Rule of Criminal Procedure 29 provides that, either upon a defendant's motion for judgment of acquittal or the trial court's own initiative, the trial court "shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Tenn. R. Crim. P. 29(b). If a defendant elects to present additional proof following the denial of a motion for judgment of acquittal at the conclusion of the State's case-in-chief, then the defendant must renew his or her motion for judgment of acquittal at the close of trial proof; otherwise, the defendant waives "any claim of error for failure to grant the motion for judgment of acquittal at the conclusion of the proof offered by the State." *State v. Collier*, 411 S.W.3d 886, 893 (Tenn. 2013), *abrogated on other grounds by State v. Thomas*, 687 S.W.3d 223, 242 (Tenn. 2024). A motion for judgment of acquittal, whether raised at the conclusion of the State's case-in-chief or the close of trial proof, presents a question of law and requires the trial court to consider the State's evidence in the light most favorable to the State; that is, if, after allowing all reasonable inferences in the State's favor there persists "any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the evidence," the trial court must deny the motion for judgment of acquittal. *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). Thus, the standard by which a trial court evaluates a defendant's motion for judgment of acquittal mirrors our standard of review for a challenge to the sufficiency of the convicting evidence. *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013). When a defendant challenges a trial court's denial of his or her motion for judgment of acquittal on appeal, we similarly apply the same standard of review as a challenge to the sufficiency of the convicting evidence. *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995).

Tennessee Rule of Criminal Procedure 33 similarly provides that, either upon a defendant's motion for a new trial or the trial court's own initiative, the trial court "may grant a new trial as required by law." Tenn. R. Crim. P. 33(a). A defendant's motion for a new trial must be made in writing "within thirty days of the date the order of sentence is entered" to preserve issues for appellate review. *Id.* at 33(b). A timely filed motion for a new trial serves the dual purposes of providing the trial court an opportunity "to avoid or rectify an error before a judgment becomes final," *State v. Minor*, 546 S.W.3d 59, 65 (Tenn. 2018), and to preserve issues for further review by an appellate court, *see* Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." *Id*. at 33(d). As the "thirteenth juror" in a criminal proceeding, the trial court must approve of the jury's verdict in order to impose a valid judgment. *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). When a trial court denies a defendant's motion for a new trial, we may presume that it has validly acted as the thirteenth juror and approved of the jury's verdict, so long as the record does not contain any indication that the trial court expressed "dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or statements indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror." *Id*. When a trial court validly acts as the thirteenth juror by approving the jury's verdict, appellate review is limited to the sufficiency of the convicting evidence; in other words, "the accuracy of a trial court's thirteenth juror determination is not a subject of appellate review." *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995) (citing *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)).

At the outset of our analysis, we note that the Defendant's challenges to the sufficiency of the convicting evidence are the same as his arguments that the trial court erred by denying his motion for judgment of acquittal, by approving the jury's verdicts as the thirteenth juror, and by denying his motion for a new trial. Although the Defendant moved for judgment of acquittal at the conclusion of the State's case-in-chief, he elected to present additional testimony and did not renew his motion at the close of trial proof. As such, the Defendant has waived any right to appeal the trial court's denial of his motion for judgment of acquittal. *Collier*, 411 S.W.3d at 893; *see also State v. Gilley*, 297 S.W.3d 739, 763 (Tenn. Crim. App. 2008). Additionally, because the trial court validly acted as the thirteenth juror by denying the Defendant's motion for a new trial, the trial court's judgment as the thirteenth juror is not subject to appellate review. *Burlison*, 868 S.W.3d at 719. The Defendant likewise challenged the sufficiency of the convicting evidence in his motion for a new trial. Accordingly, we will review the Defendant's tripartite challenges to the sufficiency of the convicting evidence as a singular claim.

- 14 -

"Findings of guilt in criminal actions . . . shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The standard of appellate review on a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citations omitted); *see also State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982); *see also Thomas*, 687 S.W.3d at 249 (citing *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000)). "On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom." *State v. Wilson*, 211 S.W.3d 714, 718 (Tenn. 2007) (citing *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999)). "We do not reweigh the evidence . . . because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury as the trier of fact." *State v. Curry*, 705 S.W.3d 176, 183 (Tenn. 2025) (citations omitted). The same standard of review applies "whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *Williams*, 558 S.W.3d at 638 (first citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); and then citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977)).

As relevant here, second degree murder is a "knowing killing of another." Tenn. Code Ann. § 39-13-210(a). Possessing a prohibited weapon occurs when a person "intentionally or knowingly possesses, manufactures, transports, repairs or sells . . . [a] machine gun." *Id*. § 39-17-1302. A machine gun is "any firearm that is capable of shooting more than two (2) shots automatically, without manual reloading, by a single function of the trigger and includes any part, or combination of parts, designed and intended solely for use in converting a firearm into a machine gun." *Id*. § 39-17-1301(10).

The Defendant's challenges to the sufficiency of the convicting evidence may be summarized and separated into two categories: first, as a challenge to the weight of the evidence, and second, as a challenge to the credibility of the witnesses. Both claims target questions of fact entrusted to the jury rather than the legal sufficiency of the evidence. The jury resolves conflicts in the evidence, determines the weight of the evidence, and evaluates witness credibility as the trier of fact at trial, not the appellate court. *Curry*, 705 S.W.3d at 183. The jury was presented with the Defendant's challenges to witness credibility and to the weight of the evidence at trial during the Defendant's cross-examination and case-in-

- 15 -

chief and rejected them, as was its prerogative as the trier of fact. We may not disturb these conclusions.

The Defendant does not allege that the State failed to prove any essential element of either offense for which he was convicted. Nevertheless, the evidence adduced at trial, viewed in the light most favorable to the State, supports the Defendant's convictions. The State elicited proof that on October 6, 2008, the Defendant became upset after a juvenile delinquency proceeding was dismissed in which the victim acted as Holden's counsel and which involved an allegation that Holden stole the Defendant's property. Nearly one year later, on August 28, 2009, the Defendant drove up to the victim's home, approached her picture window, and shot her in the head as she slept in a recliner in her living room. Investigators recovered bullet fragments from the victim's home and sent them to the TBI for examination. Special Agent Scott concluded that the bullet fragments were consistent with 7.62x54R ammunition fired from a Mosin-Nagant rifle. On October 17, 2019, law enforcement executed a search warrant for the Defendant's home and recovered, among other evidence, six Mosin-Nagant rifles and 365 7.62x54R ammunition cartridges. Special Agent Hall examined the firearms recovered from the Defendant's home and testified that they produced bullet fragments which were ballistically similar to the bullet fragments found at the victim's home following her murder. Finally, Dennis admitted to law enforcement in his October 17, 2019 interview that the Defendant confessed to killing the victim, and he reiterated this statement in a subsequent interview on August 3, 2024. This evidence is sufficient to sustain the Defendant's conviction of second degree murder.

Additionally, Sheriff Matheny testified that during the October 17, 2019 execution of the search warrant for the Defendant's home, law enforcement recovered a modified Colt AR-15 rifle. Sheriff Matheny testified that the firearm had been modified to fire automatically. Investigator Rowland identified the firearm in photographs and testified that an extra pin had been drilled into the firearm's right side, almost directly above its trigger, to permit the firearm to fire automatically. Special Agent Hall examined the firearm and testified that it had been modified to add an "auto sear" to permit it to fire automatically. Special Agent Hall further testified that the modification enabled the firearm to act as a machine gun. This proof is sufficient to sustain the Defendant's conviction of possession of a prohibited weapon. The Defendant is not entitled to relief.

## B. EVIDENTIARY ISSUES

The Defendant also argues that the trial court erred by overruling his objections to hearsay and to leading questioning during Dennis's testimony. The State responds that the trial court did not err by overruling the Defendant's objections. We agree with the State.

### 1. Hearsay

The Defendant first argues that the trial court erred by denying his hearsay objection during Dennis's testimony regarding the Defendant's confession. Specifically, he contends that Dennis's testimony that the Defendant told him he killed the victim was inadmissible hearsay, that it did not qualify under any of the recognized exceptions to the rule against hearsay, and that its admission was prejudicial. The State responds that the testimony was admissible as a statement by a party opponent.

Hearsay statements are "statement[s], other than one[s] made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay statements are inadmissible, Tenn. R. Evid. 802, unless they fall into one of the exceptions listed in Tennessee Rules of Evidence 803 and 804. "If a statement is hearsay, but does not fit one of the exceptions, it is inadmissible, and the [trial] court must exclude the statement." *State v. Kendrick*, 454 S.W.3d 450, 479 (Tenn. 2015). When considering whether a statement is inadmissible hearsay, the trial court must first determine whether the statement constitutes hearsay; if so, it must then determine whether the statement qualifies as an exception to the rule against hearsay. *Id*.

An appellate court's standard of review of a trial court's ruling on hearsay evidence is layered. *Id*. A trial court's findings of fact and credibility determinations are binding upon the appellate court unless the evidence preponderates against them. *Id*. (citing *Gilley*, 279 S.W.3d at 759-61. A trial court's conclusions of law as to whether the challenged statement is hearsay and whether it qualifies as an exception to the rule against hearsay are reviewed de novo. *Kendrick*, 454 S.W.3d at 479 (first citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); and then citing *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)). However, simply because a statement qualifies as an exception to the rule against hearsay does not mean that the trial court must admit the statement; in other words, the statement may nevertheless violate other rules of evidence. *Kendrick*, 454 S.W.3d at 479 (citing *Gilley*, 297 S.W.3d at 760-61). When the trial court concludes that a statement is inadmissible under another rule of evidence, then the appellate court reviews the trial court's decision for abuse of discretion. *State v. Howard*, 504 S.W.3d 260, 276 (Tenn. 2016) (citing *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015)). We will reverse a trial court's decision for an abuse of discretion "only when the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)) (internal quotation marks omitted).

At trial, Dennis testified that he and the Defendant rode home together from work on the day Dennis was fired. The State asked Dennis whether the Defendant said

something to him about the victim during their ride home, and Dennis agreed that he had. The State then asked, "What did he say?" The Defendant objected on hearsay grounds, and the trial court overruled the objection without elaboration.[6] Dennis then testified that the Defendant told him he had killed the victim.

Dennis's testimony regarding the Defendant's confession was plainly hearsay. But as the State notes, the trial court appropriately overruled the Defendant's hearsay objection because the statement qualified as an admission by a party opponent. Tennessee Rule of Evidence 803(1.2) provides, in pertinent part, that "[a] statement offered against a party that is . . . the party's own statement in either an individual or a representative capacity" is not excluded by the rule against hearsay. Tenn. R. Evid. 803(1.2)(A). In other words, "any assertion a party spoke, wrote, or did may be used against that party as an admission," so long as the assertion is not otherwise inadmissible pursuant to the other rules of evidence. Neil P. Cohen, et al., *Tennessee Law of Evidence*, § 8.06[3][a] (7th ed. 2024); *see also State v. Lewis*, 235 S.W.3d 136, 145 (Tenn. 2007). A party to a case is generally one who has "a right to control proceedings, to make a defense, to adduce and cross-examine witnesses, and to appeal from the judgment." *City of Chattanooga v. Swift*, 442 S.W.2d 257, 258 (Tenn. 1969). As a party to this case, the Defendant's confession to Dennis that he killed the victim was admissible as a statement by a party opponent pursuant to Rule 803(1.2)(A). The Defendant is not entitled to relief.

## 2. Leading Questions

The Defendant also argues that the trial court erred by permitting the State to ask leading questions during Dennis's testimony. The Defendant specifically notes that this occurred during Dennis's testimony regarding the Defendant's confession that he killed the victim and regarding Dennis's August 3, 2024 interview with law enforcement. The Defendant contends that the State was not permitted to ask leading questions because Dennis was not a hostile witness, an adverse party, or a witness identified with an adverse party. The State responds that the trial court did not abuse its discretion because the questions were necessary to help develop Dennis's testimony.

A trial court is vested with discretion to "exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel." Tenn. R. Evid. 611(a). Generally, counsel should not use leading questions during direct examination of a witness "except as may be necessary to develop the witness's testimony" or when a party calls a hostile witness, an adverse party, or a witness

---

[6] The trial court did not explicitly find that Dennis's testimony was not inadmissible hearsay or that it qualified as an exception to the rule against hearsay; however, in denying the Defendant's motion for a new trial, the trial court concluded that the "statement was a statement made against the Defendant's interest and a statement of a party opponent."

identified with an adverse party. *Id*. at (c)(1), (2). A leading question is one which "suggests to the witness the answer desired by the examiner." *Mothershed v. State*, 578 S.W.2d 96, 99 (Tenn. Crim. App. 1978), *superseded on other grounds by rule as stated in State v. Beaty*, No. M2014-00130-CCA-R3-CD, 2015 WL 7307993, at \*20 (Tenn. Crim. App. Nov. 20, 2015), *perm. app. denied* (Tenn. Mar. 9, 2017). We review a trial court's ruling on the presentation of evidence in relation to Tennessee Rule of Evidence 611 for an abuse of discretion. *See State v. Caughron*, 855 S.W.2d 526, 540 (Tenn. 1993); *see also State v. Hardison*, 680 S.W.3d 282, 315 (Tenn. Crim. App. 2023) ("Absent a clear abuse of discretion that results in manifest prejudice to the defendant, this court will not interfere with the trial court's exercise of its discretion on matters pertaining to the examination of witnesses."). Accordingly, in the context of a defendant's claim that the trial court erred by overruling his or her objection to the State's use of leading questions during direct examination, we will not reverse the trial court's exercise of its discretion "unless the question was not only clearly leading, but also clearly prejudicial." *State v. Williams*, No. M2019-02307-CCA-R3-CD, 2021 WL 4305899, at \*10 (Tenn. Crim. App. Sept. 22, 2021), *perm. app. denied* (Tenn. Jan. 14, 2022).

The Defendant asserts that the trial court erred by overruling two of his objections to the State's use of leading questions during Dennis's direct examination. The Defendant first identifies as error the following exchange, which occurred after Dennis testified he could not remember how the Defendant's killing the victim "came up in conversation,":

| | |
|---|---|
| THE STATE: | The day – were you in a vehicle with your father the day you got fired? |
| DENNIS: | Yes. |
| THE STATE: | And what was – what were you talking about before he said that? |
| DENNIS: | I don't think we were talking at all. I remember just we were driving home. |
| THE STATE: | Okay. You were driving home and he just out of the blue says – |
| THE DEFENDANT: | Your Honor, I'm going to object to leading. |
| THE COURT: | Overrule. |

The trial court did not abuse its discretion in overruling the Defendant's objection regarding this exchange. The Defendant has not established that the State's questions were leading. A question is not leading simply because it "allows for a 'yes' or 'no' answer." *State v. Lovin*, No. E2021-00705-CCA-R3-CD, 2022 WL 3078579, at *9 (Tenn. Crim. App. Aug. 3, 2022) (quoting *Smith v. Walker*, No. M2012-00593-COA-R3-CV, 2012 WL 4167167, at *3 (Tenn. Ct. App. Sept. 19, 2012), *no perm. app. filed*), *no perm. app. filed*. Although the State's first question referenced above permitted Dennis to simply respond in either the affirmative or the negative rather than eliciting his testimony in narrative form, and the last question before the objection seemed to be a statement by the prosecutor, the State's questions did not elicit any new proof. Dennis had already testified that he did not believe that he and the Defendant had been talking at all, and the State's questions merely served to clarify and affirm this statement for the jury. Thus, the State's questions were designed to develop the Defendant's testimony. Tenn. R. Evid. 611(c)(1). Moreover, the Defendant has not alleged, much less proven, that the questions were clearly prejudicial to his defense, so his argument is unavailing. *Williams*, 2021 WL 4305899, at *10.

The Defendant also identifies as error the following exchange, which occurred during the State's questioning Dennis regarding his August 3, 2024 statement to law enforcement:

| THE STATE: | Okay. And do you recall[,] on August 3rd of this year[,] meeting with Todd Rowland from the [District Attorney's O]ffice and Sheriff Matheny at the [District Attorney's O]ffice? |
|---|---|
| DENNIS: | Yes. |
| THE STATE: | And do you remember talking to them? |
| DENNIS: | Yes. |
| THE STATE: | Okay. And that was on the Saturday, was it not? |
| DENNIS: | Yes. |
| THE STATE: | And had you requested to come in on a Saturday because that way it wouldn't interfere with your work? |
| DENNIS: | Yes. |

| THE STATE: | Do you remember telling them about your raising growing up? |
|---|---|
| DENNIS: | Yes. |
| THE STATE: | Do you remember telling them about that [the Defendant] – |
| THE DEFENDANT: | Judge, I'm going to object to leading. |
| THE COURT: | Overrule. |

The State thereafter elicited proof that Dennis stated during his August 3, 2024 interview that the Defendant had told him that he had killed the victim during a conversation about "making mistakes" on the day Dennis was fired.

The trial court did not abuse its discretion in overruling the Defendant's objection regarding this exchange. To be sure, the nature of the State's questioning in this exchange suggested that Dennis should respond in either the affirmative or the negative. Although the State elicited new proof from this line of questioning, its questioning nevertheless served to refine Dennis's testimony by placing the Defendant's confession in context. Regardless, the Defendant has also not alleged or established that this line of questioning was in any way prejudicial to his defense. *Id.* The Defendant is not entitled to relief.

## III. CONCLUSION

Following our review of the record and based upon the foregoing analysis, we affirm the judgments of the trial court.

*s/ Steven W. Sword*

STEVEN W. SWORD, JUDGE

- 21 -